IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|   |   |   |
|---|---|---|
| | * | |
| R/C THEATRES MANAGEMENT | * | |
| CORPORATION, | * | |
| | * | |
| v. | * | Civil No. JFM-13-00984 |
| | * | |
| METRO MOVIES, LLC | * | |
| | * | |
| | * | |
| | ****** | |

## MEMORANDUM

Plaintiff/Counter-defendant R/C Theatres Management Corp. brings this lawsuit against Defendant/Counter-plaintiff Metro Movies, LLC, under Connecticut law and the Lanham Act, 15 U.S.C. § 1114(1)(a)–(b), §1125(a), alleging breach of contract, trademark infringement, false designation of origin, and unfair competition. (ECF No. 1). Metro has filed seven counterclaims. (ECF No. 4). Discovery has been completed. Now pending are two cross-motions for partial summary judgment, filed by Metro on June 19, 2014 and by R/C on July 21, 2014. (ECF Nos. 37, 40).

No oral argument is necessary. *See* Local Rule 105.6. For the reasons set forth below, the court denies Metro's motion for partial summary judgment and grants R/C's motion for partial summary judgment in part, as to its Counts II and IIa.

## BACKGROUND

R/C provides services to movie theaters by managing the day-to-day operations. Metro owns a movie theater ("theater") located at 140 Main Street, Middletown, Connecticut that is the subject of this dispute. (R/C Compl., ECF No. 1 ¶ 7). The parties entered into a Management Agreement contract on June 12, 2012, in which Metro appointed R/C to "manage" the theater for

five years commencing on July 1, 2012.  (ECF No. 40-4).  The Management Agreement assigned several specific responsibilities to R/C in return for six percent of the theater's gross receipts. (*Id.* ¶ 6).

Either party reserved the right to terminate the contract with 180 days' notice. (*Id.* ¶ 10.A & B).  Moreover, either party could also terminate upon default of the other party, with ten days' notice and opportunity to cure for monetary defaults, and thirty days' notice and opportunity to cure for non-monetary defaults.  (*Id.* 10.C).

During R/C's management of the theater, R/C affixed its label to various marketing and operations materials, including the paper stock used for tickets sold to patrons.  (Phillips Dep., ECF No. 40-14).[1]  R/C Vice President Brian Phillips oversaw R/C's management of the theater, and set up the R/C branded items for the theater.  (*Id.* at 142:18–20).  Phillips stated that it was his understanding at the time that Metro and R/C had agreed to use R/C's logo to provide the theater with "a new brand identity," and that R/C's logo would be used on Metro materials while R/C was managing the theater.  (*Id.* at 141–43).  Phillips did not recall Metro asking him to remove R/C's logo while R/C managed the theater. (*Id.* at 162:9–12).

Almost seven months later, Metro President Lawrence Goichman informed R/C President Scott Cohen via a January 28, 2013 letter that Metro was "exercising [its] right to terminate pursuant to Section 10 (A)," and provided Metro with 90 days' notice.  (ECF No. 40-5; Goichman Dep., 40-12 at 15:1–8).  Cohen responded on January 31, 2013, referencing a

---

[1] R/C's mark is registered in the Principal Register of the U.S. Patent and Trademark Office, Registration No. 2,740,278.  (ECF No. 1 ¶ 25; ECF No. 1-1).

discussion with Goichman and accepting Goichman's intent to terminate, but reminded

Goichman of the 180 day notice requirement in the Management Agreement.  (ECF No. 40-6).[2]

Goichman also sent Cohen a two-page letter on January 31 that referenced seven R/C

defaults and demanded that R/C cure them within 10 days.  (ECF No. 40-7; Cohen Dep., ECF

No. 40-8 at 179:3–181:19).[3]  Moreover, and allegedly unbeknownst to R/C, Metro mailed a letter

also dated January 31 to film distribution companies informing them that Metro had "changed

management companies and will no longer be using RC Theatre Management Corp."  (ECF No.

40-10).  Goichman stated that this letter had been sent only after R/C had "replaced themselves"

as manager of the theater.  (Goichman Dep., ECF No. 40-12 at 17:21–18:19).

R/C's counsel sent Goichman a response on February 1, 2013 that refuted R/C's alleged

seven defaults and informed Goichman that R/C considered Metro in material breach for

"seeking to improperly terminate the Management Agreement with less notice than prescribed in

the Agreement."  (ECF No. 40-9).  The letter stated R/C's willingness to consider "an amicable

resolution" to the brewing dispute.  *Id.*

---

[2] Cohen claims that during the discussion referenced in his January 31 letter to Goichman, Goichman stated "Well, I'm just going to break it, and that's that," referring to the Management Agreement and its 180 day termination provision.  (Cohen Dep., 40-8 at 181:2–18).
[3] R/C's alleged defaults were: (1) it was not to pay "any bill or charge" without true and correct invoices and had to present Metro with a full accounting for all prior payments; (2) all receipts were to be deposited into the Metro account every day with proof; (3) it had not been making payments pursuant to the approved budget and all future payments required Metro approval; (4) it had to reimburse Metro "for any and all unbudgeted payments;" (5) it had to provide proof of insurance and "[b]ack-up invoices for all insurance payments;" (6) it had to return a projector ordered without Metro's consent; and (7) it had to terminate the Windsor Sanitation Contract because it "lacked the requisite thirty day termination provision."  The letter also listed four "operational defaults:" the books and records were not accessible to Metro, the staff supervision was inadequate, R/C had "unilaterally implemented pricing concessions" for tickets and food, and R/C had "negligently discounted ticket prices" on Christmas and New Year's days.  (ECF No. 40-7).

Metro began managing and operating the theater itself in early February 2013, and R/C requested that Metro remove R/C's logo from any remaining materials.  (Phillips Dep., ECF No. 40-14 at 162–63).  Metro agrees that it continued to use paper stock branded with the R/C logo on which it printed tickets for a period of time after it terminated the Management Agreement, but "used commercially reasonable best efforts to remove R/C's mark from all aspects of the operation . . . as quickly as possible" and had "timely ceased all use of the R/C ticket stock" even though it was not required to do so because it had paid for the stock itself.  (ECF No. 43 at p. 4) (characterizing R/C's argument as about "simply the use of the existing Metro-owned and R/C branded items after the relationship terminated").[4]  Metro continued to use the R/C logo through at least April, however, as evidenced by a ticket stub dated April 6, 2013 that clearly contains the R/C logo.  (Cohen Dep., ECF No. 40-8 at 130:15–21; ECF No. 40-19).

### A. R/C's complaint and Metro's counterclaims.

R/C filed a complaint against Metro on April 2, 2013, claiming that Metro had committed: breach of contract (Count I), trademark infringement (Count II), false designation of origin (Count IIa), and unfair competition (Count III).[5]  The essence of R/C's complaint is that Metro wanted to terminate the Management Agreement without providing the 180 days' notice and accordingly came up with various alleged defaults that would permit it to trigger the shorter ten or thirty day termination option.  Moreover, R/C claims that Metro committed trademark infringement by continuing to use the R/C logo without its permission.

---

[4] Metro also argues in its reply brief that it had "made it clear to R/C during their [sic] operation of the Cinema that Metro did not want the R/C mark on any goods or merchandise."  (ECF No. 43 at p. 3).  Metro does not cite any evidence in the record, however, to support this statement.

[5] Although R/C's complaint listed its false designation of origin claim also as "Count 2", it has subsequently referred to it as "Count 2(a)."  (ECF No. 40).

Metro answered on April 19, 2013, listing seven affirmative defenses and also filing seven counterclaims against R/C: breach of contract (Count I), conversion (Count II), and mismanagement (Count III).[6]  Metro's essential contention is that R/C had violated the Management Agreement by failing to properly perform its accounting duties and by taking unilateral actions without justification.

**B.  Metro and R/C file motions for partial summary judgment.**

Metro filed a motion for partial summary judgment on June 19, 2014, seeking judgment in its favor on R/C's Counts I (breach of contract), II (trademark infringement) and IIa (false designation), and also on Metro's own Counts I and III (breach of contract and mismanagement). (ECF No. 37).  R/C responded on July 21, 2014 with its own motion for partial summary judgment, seeking relief in its favor on its Counts I, II and IIa, and also judgment in its favor on Metro's Counts I and III.

## STANDARD

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P 56(a); *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When reviewing a motion for summary judgment, the court must look at the facts and inferences drawn from there in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

---

[6] Neither R/C or Metro address Metro's last four counterclaims in their respective motions for partial summary judgment, but Metro also counterclaims for: breach of scope of management agreement, false designation of origin, unfair competition, and Metro also seeks cancellation of R/C's trademark.

Although the moving party bears the burden to demonstrate the absence of any genuine issue of material fact, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), the non-moving party may not merely rest upon allegations or denials in pleadings, but must, by affidavit or other evidentiary showing, set out specific facts showing a genuine issue remains for trial. Fed. R. 5 Civ. P. 56(c)(1)(A). A court should enter summary judgment where a non-moving party fails to make a sufficient showing to establish the elements essential to the party's claim and on which the party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322.

If there is insufficient evidence for a reasonable jury to render a verdict in favor of the non-moving party, there is no genuine issue of material fact, and summary judgment may be granted. *See Anderson*, 477 U.S. at 248. The court must not yield its obligation "to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003). Conversely, the motion should be denied if factual issues exist "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## ANALYSIS

I.   **Applicable Law.**

   **A.  Connecticut Contract law Governs the Management Agreement.**

Section 13 of the Management Agreement is a choice-of-law provision that specifies the contract "shall be governed by and construed under the laws of the State of Connecticut." (ECF No. 40-4). Both parties agree that Connecticut law applies. (ECF No. 37-1 at p. 12; ECF No. ECF No. 40-1 at p. 19 n. 20).

Maryland law applies Section 187 of the Restatement (Second) of Conflict of Laws. *E.g.*, *Kunda v. C.R. Bard, Inc.*, 671 F.3d 464, 467 (4th Cir. 2011) (citing *Jackson v. Pasadena*

*Receivables, Inc.*, 921 A.2d 799 (Md. 2007)).  A choice-of-law provision is enforced unless the chosen state "has no substantial relationship to the parties or the transaction," or if applying the "law of the chosen state would be contrary to a fundamental policy" of Maryland.  *Id.*  Here, because the theater is located in Connecticut and there is no indication that the relevant Connecticut law is contrary to any fundamental policy of Maryland, the court will apply Connecticut law when interpreting and ruling on the Management Agreement.  *See id.*

### B.  Fourth Circuit law Governs R/C's Trademark Infringement Claim.

A claim of trademark infringement arises under the Lanham Act.  15 U.S.C. §§ 1114(1)(a)–(b), 1125(a); *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 152 (4th Cir. 2012). Because Section 13 of the Management Agreement only contemplates applying Connecticut law to the Agreement itself, and the Agreement is silent on R/C's trademark, the court will apply the Fourth Circuit's interpretation of the Lanham Act.  *See Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999) (framing the inquiry as whether a choice-of-law provision is "sufficiently broad to encompass" the cause of action at issue).

## II.    Cross-Motions for Partial Summary Judgment.

Both R/C and Metro filed for partial summary judgment on the same counts: R/C's Counts I, II and IIa, and Metro's Counts I and III.  Accordingly, the court will discuss whether summary judgment is proper by count rather than by each motion.

### A.  Breach of the Management Agreement.

R/C's Count I and Metro's Counts I and III allege various acts or omissions by the other party that placed it in material breach of the Management Agreement.  Metro argues that R/C breached the Management Agreement first by paying itself from the operating account without prior approval, for refusing to document those payments at Metro's request, and for anticipatory

repudiation.  R/C argues that it was never in default, did not repudiate the contract, and that

Metro breached the Agreement by terminating it without cause and before the 180 days' notice

period had passed.

### 1. R/C's alleged anticipatory repudiation.

The court first addresses whether R/C committed an anticipatory repudiation of the

Management Agreement through its counsel's February 1, 2013 letter to Goichman.  (ECF No.

40-9).  Under applicable Connecticut law, a party that repudiates its contractual duties before the

time for performance has arrived allows the other party to terminate the contract and initiate an

action.  *See, e.g.*, *Land Grp., Inc. v. Palmieri*, 1 A.3d 234, 239–40 (Conn. 2010).  A party's

repudiation "may be verbal or nonverbal, and is largely a factual determination."  *Id.* at 239.

Most importantly, the party's intent to stop performance must be "definite and unequivocal."

*Andy's Oil Serv., Inc. v. Hobbs*, 9 A.3d 433, 442 (Conn. App. Ct. 2010) (quoting *Koski v. Eyles*,

440 A.2d 317 (1981)).

Here, Metro claims that R/C's counsel's February 1, 2013 letter "made clear that [R/C]

would not perform its obligation to cure the defaults, as was demanded by Metro."  (ECF No. 37-

1 at p. 15).  Metro is mistaken.  As R/C correctly argues, its February 1 letter was responding to,

and refuting, Goichman's January 31 letter that listed seven defaults.  (ECF No. 40-9).  The letter

then accused Metro of three defaults, but concluded by stating a willingness to "discussing an

amicable resolution of this matter."  (*Id.* at p. 3).  That is not a sufficiently "definite and

unequivocal" statement indicating that R/C intended to stop its performance under the

Management Agreement.

Moreover, the terms of the Management Agreement required Metro to provide R/C with ten days to cure monetary defaults, as the Goichman letter stated.[7]  Goichman's letter is dated February 1, providing R/C until February 11 to cure.  By February 1, however, Metro had already submitted a letter to film distribution companies that stated it had replaced R/C as manager.  (ECF No. 40-10).  Rather than providing R/C an opportunity to cure, Metro took immediate steps to remove R/C as manager of the theater.  Whether that constituted a material breach by Metro is discussed further below, but at the very least it negates Metro's argument that R/C's response letter constituted an anticipatory repudiation.  *See, e.g.*, *Wyatt Energy, Inc. v. Motiva Enters., LLC*, 19 A.3d 181, 191 (Conn. App. Ct. 2011) (affirming that a party's "belief that [the other party] would not cure the default" does not support an anticipatory repudiation argument).  Because R/C was simply contesting its alleged defaults while continuing to perform under the Management Agreement, the court rejects Metro's anticipatory repudiation argument.

### 2.  Whether R/C or Metro materially breached the Management Agreement.

In their respective motions for partial summary judgment, both R/C and Metro argue that the other party materially breached the Management Agreement.  Metro agrees that it "did so treat the Management Agreement as terminated and, therefore, took back operation of the Cinema from R/C."  (ECF No. 37-1 at pp. 2–3).[8]  Metro contends that R/C breached the Management Agreement, which R/C disputes and argues in turn that Metro breached the Agreement first without justification.

---

[7] R/C argues that the alleged defaults were non-monetary, requiring a thirty day opportunity to cure.  (ECF No. 44 at p. 4) ("None of the defaults alleged in Metro's January 31, 2013 letter were monetary, and thus, R/C should have been given 30 days to cure the default.").  Whether the defaults were monetary or not, the fact remains that Metro did not provide even ten days to cure.

[8] Metro also states that it "properly terminated the Management Agreement because of R/C's mismanagement."  (ECF No. 43 at p. 2).

Metro argues that there are undisputed material facts illustrating that R/C failed to comply with the Management Agreement and Metro's reasonable requests for documents and information.  (ECF No. 37-1 at p. 12).  Whether a party materially breached a contract such that the other party is relieved of further performance turns on a multifactor test.  *See, e.g.*, *Shah v. Cover-It, Inc.*, 859 A.2d 959, 963 (Conn. App. Ct. 2004) (citing Restatement (Second) of Contracts § 241).  Rather than apply that test to each alleged breach or default committed by R/C (or Metro), the court instead holds that R/C has met its burden under Rule 56 to withstand summary judgment by citing sufficient evidence in the record to dispute several material facts.  Summary disposition of either parties' breach of the Management Agreement claims, therefore, is improper.

Indeed, R/C has cited evidence that disputes almost every one of its alleged defaults.  For example, Metro claims that R/C never provided it with a 2012 budget.  (Goichman letter, ECF No. 40-7 ¶ 3; ECF No. 37-1 at p. 13; ECF No. 43 at p. 2).  In response, Phillips states that R/C did prepare a 2012 budget, which is included as an exhibit.  (ECF No. 40-3 ¶ 4; ECF No. 40-13).  R/C also produced an email from Phillips to a Metro employee discussing the 2013 budget.  (ECF No. 40-15).  It is possible that Metro never received the 2012 budget until discovery, as they claim, (ECF No. 43 at p. 2), but R/C has produced enough evidence to dispute that fact.

In addition, Metro claims that R/C has not accounted for $412,896.19 that R/C paid itself from the theater operating account.  (ECF No. 37-1 at pp. 8–9).  In support of that allegation, Metro included several hundred pages of "check runs" and a declaration by Metro employee Linda Gargano.  (ECF No. 37, exhibits C; D; E ¶ 2).  In response, Phillips asserts that Metro did not include "the first 417 pages of expense documentation" produced by R/C that document the disputed amount claimed by Metro and, moreover, that during discovery R/C provided

documentation accounting for every charge except three totaling $15,650.  (ECF No. 40-3 ¶¶ 13–16).  R/C also highlights Section 2.H of the Management Agreement, which only requires pre-approval by Metro of non-budgeted expenses over $5,000.  (ECF No. 40-1 at p. 11).  Because whether R/C provided Metro with a budget is disputed, as discussed above, whether R/C properly paid itself from the operating account is also in dispute.

These examples demonstrate that summary disposition of R/C's and Metro's breach of contract claims against each other is improper.  Each party has produced evidence that places several material facts in dispute.  When such disputes can "reasonably be resolved in favor of either party," summary judgment should be denied.  *Anderson*, 477 U.S. at 250.  Accordingly, the court denies Metro's motion for partial summary judgment on its Counts I and III and also denies R/C's motion for partial summary judgment on its Count I.

### B.  Trademark Infringement.

To prevail on its trademark infringement claim under the Lanham Act, R/C must prove that it: (1) owns a valid mark, (2) Metro used the mark "in commerce" without R/C's permission, (3) Metro used the mark in connection with selling or distributing goods or services, and (4) Metro's use of the mark was likely to confuse consumers.  15 U.S.C. § 1114(a); *see also Rosetta Stone Ltd.*, 676 F.3d at 152.[9]  Here, R/C has a registered trademark for its "R/C" logo (ECF No. 1-1), and Metro agrees that it used R/C's mark in commerce and in connection with goods or

---

[9] R/C also seeks summary judgment on its false designation of origin claim, Count IIa.  Although its arguments and citations focus on infringement under § 1114, a claim under § 1125(a)(1)(A) is legally quite similar.  *See, e.g.*, *Universal Furniture Intern., Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 438 (4th Cir. 2010) ("The Lanham Act prohibits a false designation of origin that is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association . . .  or as to the origin of goods, services, or commercial activities.") (internal quotation marks omitted).  Here, R/C argues that by continuing to sell tickets with R/C's logo, Metro caused consumers to be deceived as to the actual origin of the theater's management.

services by selling tickets with the R/C logo on them.[10]  (ECF No. 37-1 at pp. 15–17).  The

parties dispute whether Metro was permitted to continue using materials with R/C's mark after

the Management Agreement ended, and whether that use was likely to confuse consumers.

Metro also seeks summary judgment in its favor on R/C's trademark infringement claims

because Metro claims R/C "cannot prove monetary damages."  (ECF No. 37-1 at p. 19). Each

issue is addressed in turn.

### 1. Metro was not authorized to continue using R/C's mark.

Metro has two responses to R/C's allegation that it continued to use R/C's mark on Metro

products without R/C's authorization.  First, Metro argues that because R/C used Metro's money

to purchase the R/C-branded ticket stock, Metro "was entitled to with them [sic] what it wanted

without a contractual obligation to the contrary."  (ECF No. 43 at p. 5).  Metro also argues that it

reasonably purchased new blank ticket stock as soon as practicable and that by the end of

February 2013 "Metro had blank ticket stock and was using it."  (ECF No. 37-1 at p. 16).  Metro

is mistaken as to both the undisputed facts and the law.

First, the facts.  R/C asked Metro to cease using R/C's mark soon after Metro began

managing the theater, indicating its lack of authorization.  (ECF No. 40-8 at 162:13–163:1).

Metro has cited evidence that it placed orders for blank ticket stock beginning on February 26,

2013 (ECF No. 37, exhibit K), and states it "timely ceased all use of the R/C ticket stock."  (ECF

No. 43 at p. 4).  Even if it did purchase blank stock, there is undisputed evidence that Metro

continued to use the R/C mark on ticket stubs as late as April 6, 2013.  (ECF No. 40-19).  By that

point, it had been at least one month since Metro began managing the theater instead of R/C.

---

[10] In one of its briefs Metro states that "Metro made it clear to R/C during their operation of the
Cinema that Metro did not want the R/C mark on any goods or merchandise."  (ECF No. 43 at p.
3).  This statement, however, is not supported by a citation to any evidence.

Moreover, Metro has not explained why it continued to use R/C-branded stock into April without R/C's consent.

Second, the law.  In explaining its use of R/C-branded stock, Metro argues that it was entitled to do so because Metro paid for the stock.  (ECF No. 37-1 at p. 16).  Metro cites a "first sale doctrine" that it claims justifies the owner of an item with a trademark to "reuse/resell the item even if doing so requires the use of the trademark."  (ECF No. 43 at p. 5).  Metro may be referring to nominative fair use, which this circuit has held applies to situations "in which the defendant uses the plaintiff's trademark to identify the plaintiff's own goods."  *Rosetta Stone Ltd.*, 676 F.3d at 154.  The *Rosetta Stone* court cited as an example an auto repair shop that advertises it repairs foreign cars by displaying those cars' trademarks.  *Id.*  That is not what Metro did here.  Because R/C was no longer managing the theater, there were no "R/C goods" that Metro was attempting to identify by using R/C's mark on tickets it sold.[11]  Metro, therefore, cannot cite fair use as a defense.

Accordingly, there is undisputed evidence that Metro continued to use R/C's mark without R/C's authorization.

### 2.  Metro's continued use of R/C's mark was likely to confuse consumers.

Courts look to nine factors when analyzing the final element of a trademark infringement claim: likelihood of consumer confusion.  *E.g.*, *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009).[12]  The nine factors are not a formula to be applied rigidly, but

---

[11] Metro also cites its good faith effort to timely remove the R/C logo.  Although good faith is relevant to a fair use argument, *see Shakespeare Co. v. Silstar Corp. of Am., Inc.*, 110 F.3d 234, 240 (4th Cir. 1997), Metro's use of the R/C mark as late as April 6 belies its alleged good faith efforts.

[12] "A likelihood of confusion exists if the defendant's actual practice is likely to produce confusion in the minds of consumers about the origin of the goods or services in question." *Id.* (internal quotation marks omitted).

instead serve as a guide for courts. *See id.*[13]  Indeed, several courts have held that when a party

continues using a trademark after the license authorizing such use has expired, that factual

scenario *alone* "satisfies the likelihood of confusion test and constitutes trademark

infringement," without analyzing each specific factor separately. *Merry Maids Ltd. P'ship v.*

*Kamara*, 33 F. Supp. 2d 443, 445–46 (D. Md. 1998) (citing *Burger King Corp. v. Mason*, 710

F.2d 1480, 1492–93 (11th Cir. 1983)).

 Although the relationship between Metro and R/C was not that of a franchisor-franchisee,

the court finds the franchisee analogy persuasive and applicable here.  Any Metro cinema

customer who bought tickets on April 6, 2013, would have seen the R/C trademark printed on the

ticket stub.  One purpose of the Lanham Act is to help prevent confused consumers from

incorrectly assigning blame to a trademark owner who was not involved in the transaction.  Here,

any unhappy Metro theater customers might have looked at their ticket and assumed R/C was to

blame, even though R/C was no longer associated with the theater.

 In response, Metro argues that R/C has not provided any evidence of actual confusion

(ECF No. 37-1 at p. 18), and that Metro's good faith, reasonable efforts to remove the R/C logo

immunize it from liability under the Lanham Act.  *Id.*  Both arguments fail as a matter of law.

First, the test for direct infringement is clear: R/C must show a *likelihood* of confusion, not actual

confusion.  *See Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 933 (4th

Cir. 1995); *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 269 (4th Cir. 2006) (noting

that "proof of actual confusion is not necessary to show a likelihood of confusion," even through

---

[13] The Fourth Circuit has recently suggested that district courts should "provide at least a brief explanation" if it does not address every factor.  *Rosetta Stone Ltd.*, 676 F.3d at 155.  In this case, however, the facts are similar to other holdings in which continued use of a trademark after a license expired was sufficient on its own to constitute a likelihood of consumer confusion.  Moreover, this case is unlike many other direct infringement cases because there are not two competing trademarks, only Metro's continued use of R/C's trademark.

such proof can be persuasive).  Furthermore, as discussed above, several courts have held that a party's continued use of a trademark after its authorization to do so has expired constitutes a clear probable risk that consumers will be confused.

Second, Metro's alleged good faith efforts to remove R/C's logo (notwithstanding its use as late as April 6, 2013) is an insufficient defense.  *See Motor City Bagels, LLC v. Am. Bagel Co.*, 50 F. Supp. 2d 460, 485–86 (D. Md. 1999) (holding that despite plaintiff's efforts to remove defendant's logo from several materials and products, "the use of [defendant's] *register receipts* would further contribute to the likelihood of consumer confusion") (emphasis added); *see also World Gym Licensing, Ltd. v. Fitness World, Inc.*, 47 F. Supp. 2d 614, 623 (D. Md. 1999) ("Good faith is not a defense to trademark infringement.").  Metro's intent does not excuse the undisputed facts showing that it continued to use R/C's valid and registered trademark for over one month after the parties terminated their relationship.  Precisely how long Metro was allowed to continue using R/C's mark in good faith is not relevant here, for it continued to do so for at least several weeks.  Undisputed material facts, therefore, satisfy all four elements of R/C's trademark infringement claim against Metro.

### 3.  R/C need not prove actual damages to withstand summary judgment.

As a final argument, Metro claims that R/C must prove money damages, and because it cannot the court should grant Metro's motion for partial summary judgment.  Metro is once again mistaken.

It is true that courts should consider six factors before awarding damages in a trademark infringement case.  *E.g.*, *Synergistic Intern., LLC v. Korman*, 470 F.3d 162, 174–75 (4th Cir. 2006).  It is also true, however, that a plaintiff who prevails on the merits of an infringement claim is entitled "to at least nominal damages."  *7-Eleven, Inc. v. McEvoy*, 300 F. Supp. 2d 352,

356–57 (D. Md. 2004).  A plaintiff who prevails may also be entitled to injunctive relief.  *E.g.*, *Lone Star Steakhouse & Saloon, Inc.*, 43 F.3d at 935 (noting that the plaintiff showed "a strong likelihood of confusion sufficient to warrant an injunction for trademark infringement").

Accordingly, for the reasons stated above, the court denies Metro's motion for summary judgment on R/C's Counts II and IIa and grants R/C's motion for partial summary judgment on its Counts II and IIa.

R/C's motion for summary judgment on its Counts II and IIa is granted.  A separate order affecting for the ruling in this Memorandum is being entered herewith.


_____09/04/2014_____                    _____/s/_____
Date                                          J. Frederick Motz
                                              United States District Judge